1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10

11   PAUL DOUGLAS LOUTZENHISER,                No. C 03-4786 RMW (PR)

12                    Petitioner,              **ORDER DENYING PETITION FOR
                                               WRIT OF HABEAS CORPUS**
13        v.

14   TOM L. CAREY,

15                    Respondent.

16   _____/

17

18                              **INTRODUCTION**

19        Petitioner Paul Douglas Loutzenhiser, a California state prisoner who is proceeding pro se,

20   filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction

21   for attempted murder, conspiracy to commit murder, and solicitation for murder.  The court issued

22   an order to show cause why the petition should not be granted.  Respondent filed an answer and

23   exhibits with the court and petitioner filed a traverse.   For the reasons given herein, the court

24   DENIES the petition.

25                              **BACKGROUND**

26        The charges against petitioner arose from his attempts to hire someone to murder his wife.

27   The California Court of Appeal summarized the facts as follows:

28   //

[Petitioner] had solicited his son, Myles Dolan Loutzenhiser (Myles), to kill his wife. Myles was not prosecuted for these crimes, however, because the corpus delicti rule would have made it impossible to convict him.

[Petitioner]'s jury trial began on July 24, 2000, after [petitioner] had pleaded not guilty to the charges and denied the enhancement allegation. At trial, it was established that [petitioner] and Leslie Loutzenhiser (Leslie) had been married for 12 years at the time of trial. From previous marriages, [petitioner] had Myles, who was 25 years old at the time of trial, and Leslie had a daughter who was the same age as Myles. During his childhood years, Myles visited his father every summer. When he was 14 years old, Myles moved permanently into the home of [petitioner] and Leslie.

[Petitioner] was sometimes verbally and physically abusive toward Myles, and he kicked him out of the house in 1993 or 1994. Myles joined the United States Marine Corps in 1995 but, in October 1998, he was given a bad conduct discharge because he had forged checks. Myles moved back into the home of Leslie and [petitioner]. [Petitioner] and Myles now seemed to have a positive relationship.

On a trip to Disney World in November 1998, [petitioner] spoke to Myles about murdering Leslie. [Petitioner] offered to give Myles $30,000 plus his educational expenses for killing her. Myles agreed to help because he claimed he was afraid of [petitioner]. [Petitioner] told Myles that he had previously hired people to kill Leslie, but these people had not worked out.

When they returned, Myles got his own apartment with [petitioner]'s financial help. In December 1998, [petitioner] called Myles and said he should kill Leslie at the home of a family friend, Dale Zumfelde (Zumfelde), who was on vacation at the time. [Petitioner] stated that he would ask Leslie to check the furnace at Zumfelde's house, and that Myles should arrive at the house before Leslie. He told Myles to break Leslie's neck and then, with her inside, set fire either to her vehicle or Zumfelde's home. [Petitioner] reported that he had filled two antifreeze containers with gasoline and had left them in Zumfelde's barn. Myles agreed to the plan.

About three or four days later, [petitioner] told Leslie to go to Zumfelde's house and try to start the furnace. Leslie went over to the house and entered it. She returned to her vehicle to retrieve a flashlight when she observed someone dressed in all dark clothing run inside the house. She became frightened, entered her vehicle, locked the doors, and began honking the horn.

Myles had entered Zumfelde's house, intent on killing Leslie. He looked for her in the house, but could not find her. He then heard the car horn and went outside. Leslie greeted him and told him that he had scared her. At that point, Myles knew he could not kill her. Leslie gave Myles a ride down the hill.

Myles called [petitioner] when he returned home to tell him what had happened. [Petitioner] told him to retrieve the antifreeze containers that had gasoline; Myles agreed to do this, but never did it.

[Petitioner] had further discussions with Myles in early 1999 about how to kill Leslie. Leslie was planning to drive to the home of [petitioner]'s sister in Eureka on December 3, 1999, and [petitioner] was to drive there on the following day. [Petitioner] told Myles that he had somebody ready, that the plans were set, and that there was no time to waste.

In November 1999, Myles told Detective Lance Badger (Badger) of the Santa Rosa Police Department that his father wanted him to murder or to help somebody murder his stepmother, Leslie. At Badger's request, Myles made phone calls to [petitioner] and secretly recorded them. During a recorded conversation on November 23, 1999, [petitioner] asked,

"Are you still in?" Myles responded, "Totally." [Petitioner] said, "Everything's all set on my end. There's two ways we can do it." [Petitioner] responded that everything was set on his end. He explained that there was a secluded rest stop on the way to his sister's house in Eureka, and they could set it up for "it to happen." He said that he had a person to do the job and that Myles should drive this person. Myles mentioned that he had a friend named Eric who had some "pretty ruthless" friends who were "willing to do anything." [Petitioner] said that he did not have any "front money" but he would give Myles money afterwards. [Petitioner] said that if Eric can "do it," then "the best way" would be to "call in about the car," take the car for a test drive, "an[d] then boom."

Myles called [petitioner] again on November 29, 1999. Myles reported that Eric had a friend named Casey who was going to "do it." [Petitioner] warned Myles to get rid of the evidence. Myles called again that day, and Detective Goldschlag, pretending to be Eric, spoke to [petitioner].

Myles called again the next day and told [petitioner] that Eric need photographs of Leslie and $300 to get a gun to kill Leslie. He said that Eric would want about $8,000 three weeks later. [Petitioner] said he would give Eric the "up front" money plus "about two grand" for now.

On December 1, Myles arranged to meet [petitioner] at a fast food restaurant. At the meeting, [petitioner] gave Myles an envelope with photographs of Leslie and the vehicle, $300 in cash, and $6 for Myles's lunch. When Myles walked away, police arrested [petitioner].

With Zumfelde's permission, the police went to his barn and found two antifreeze cans. The cans contained gasoline. Zumfelde had not put in his barn any gasoline in antifreeze cans, nor had he give anyone permission to do so.

The prosecution presented evidence that Leslie had life insurance policies for $500,000, $159,000, and $400,000, and that the policies listed [petitioner] as the beneficiary.

At the close of the prosecution's case-in-chief, pursuant to section 1118, [petitioner] moved for acquittal as to the crime of attempted murder. The court denied this motion.

[Petitioner] then testified. He stated that he had never conspired nor solicited anyone to kill Leslie. He denied putting the containers of gasoline in Zumfelde's barn. [Petitioner] testified that Myles believed that he and Leslie "owed" him.

[Petitioner] testified that on December 21, 1998, he called Leslie and told her to go to Zumfelde's house to make sure the pipes did not freeze. He told her that Myles was going to meet her at the house to get his mail.

On January 1999, [petitioner] testified that Myles confronted him and was resentful over what [petitioner] had done for Leslie and Leslie's daughter. According to [petitioner], Myles said, "You can do everything for those two bitches, but nothing for me." Myles told [petitioner] that he had intended to kill Leslie and burn down the house when he met her at Zumfelde's house. Myles pulled a miniature bat out of his jacket and hit [petitioner] across the legs with it. Myles told him that he would implicate [petitioner] in his plot to kill Leslie if [petitioner] did not get him an apartment, let him use furniture [petitioner] was not using, and help him with his monthly expenses. [Petitioner] agreed, and never told anyone about it, because of fear of retribution.

Myles was afraid that [petitioner] would go to the police so he told [petitioner] to engage in these tape-recorded telephone conversations. [Petitioner] simply followed Myles's prearranged instructions and made incriminating statements about plotting to kill Leslie. [Petitioner] stated that he intentionally made inconsistent statements so that it would be clear

he had not intended to kill Leslie. For example, he said Leslie was to be killed on December 4 on her way to Eureka, but he knew that Leslie would already be in Eureka by then.

On August 11, 2000, the jury found [petitioner] guilty on all three counts and found true the allegation that the attempted murder was committed willfully, deliberately, and with premeditation. The court sentenced [petitioner] to the aggravated term of nine years on solicitation to commit murder and a consecutive term of 25 years to life on conspiracy to commit murder. The court stayed the sentence on the attempted murder pursuant to section 654.

People v. Loutzenhiser, No. A093572, 2002 WL 1308295 at *1-3 (Cal. App. June 14, 2002).

In 2000, a state jury in Sonoma County, California convicted petitioner of attempted murder (Cal. Pen. Code §§ 187; 664), conspiracy to commit murder (Cal. Pen. Code §§ 182, 187), and solicitation for murder (Cal. Pen. Code § 653(b)). Id. at *1. The Superior Court for the County of Sonoma sentenced petitioner to thirty-four years to life in state prison. Id. at *3. The California Court of Appeal for the First Appellate District, in an unpublished opinion, affirmed the conviction and sentence in 2002. Id. at *9. The California Supreme Court denied review in 2002. Ans., Ex. D at 1. Petitioner's habeas petitions, filed with the state superior, appellate and supreme courts, were denied. Pet. at 4-5. He filed the instant federal habeas petition in 2003.

As grounds for federal habeas relief, petitioner alleges: (1) the evidence was insufficient as a matter of law to convict petitioner of conspiracy to commit murder and attempted murder; (2) ineffective assistance of trial counsel in counsel's failure to introduce crucial evidence at trial, call important defense witnesses, introduce evidence to impeach a key prosecution witness, move for severance of the counts, and object to multiple instances of prosecutorial misconduct and to the use of perjured testimony; and (3) ineffective assistance of appellate counsel in counsel's failure to raise certain issues on appeal.

**STANDARD OF REVIEW**

A federal habeas court will entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court may not grant a petition with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. (Terry) Taylor, 529 U.S. 362, 412-413 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

The state court decision to which section 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-1092 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, in this case the opinion of the California Court of Appeal. See Ylst at 801-806; Shackleford v. Hubbard, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Id. If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 532 U.S. 782,

795 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993)).

**DISCUSSION**

I.     <u>Insufficient Evidence of Conspiracy to Commit Murder and Attempted Murder</u>

Petitioner contends that the People's failure to prosecute Myles for conspiracy and attempted murder because of a lack of evidence precludes the People from prosecuting petitioner as a co-conspirator and aider and abettor to attempted murder. Pet., P. & A. at 3. In other words, petitioner contends that if there was insufficient evidence to convict Myles, there was insufficient evidence convict petitioner.

The state appellate court observed that the People did not prosecute Myles because, "the corpus delicti rule prevented any prosecution of Myles because there was no evidence of the conspiracy independent of Myles's extrajudicial statements." <u>Loutzenhiser</u>, 2002 WL 1308295 at *4. The state appellate court stated that "[t]here was no requirement, and indeed [California case law] [] makes it clear that it was not required [] that a jury must convict Myles of conspiracy in order to convict his coconspirator of conspiracy. Simply because Myles could escape prosecution for his crimes because of the corpus delicti rule does not mean that [petitioner] should escape punishment when substantial evidence supported his conviction." <u>Id.</u> at *5.

California's corpus delicti rule is a rule of corroboration. It "requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions." <u>Loutzenhiser</u>, 2002 WL 1308295 at *5. "The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." <u>People v. Jennings</u>, 53 Cal.3d 334, 364 (Cal. 1991), (quoting <u>People v. Hamilton</u>, 48 Cal.3d 1142, 1175 (Cal. 1989)).

A selective prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. <u>See</u> <u>United States v. Armstrong</u>, 517 U.S. 456, 463 (1996). Although the decision whether to prosecute and what charges to bring generally rests entirely in the prosecutor's discretion, this discretion is subject to constitutional constraints. <u>See id.</u> at 464. One of these constraints is that the prosecutorial decision may not violate equal protection by resting on "'an unjustifiable standard such as race, religion, or other arbitrary classification.'" <u>Id.</u> (citation omitted).

Courts presume that prosecutors have properly discharged their official duties. <u>See id.</u> In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "'clear evidence to the contrary.'" <u>Id.</u> (citation omitted). Unsupported allegations of selective prosecution are not enough. <u>See United States v. Davis</u>, 36 F.3d 1424, 1433 (9th Cir. 1994), <u>cert</u>. <u>denied</u>, 513 U.S. 1171 (1995); <u>see also United States v. Buffington</u>, 815 F.2d 1292, 1305 (9th Cir. 1987) (speculation of selectivity by black defendant previously acquitted of officer's murder, without additional proof, insufficient to establish selective prosecution).

A prosecutor's charging decision cannot be judicially reviewed absent a prima facie showing that it rested on an impermissible basis, such as gender, race or denial of a constitutional right. <u>See United States v. Diaz</u>, 961 F.2d 1417, 1420 (9th Cir. 1992); <u>United States v. Redondo-Lemos</u>, 955 F.2d 1296, 1302 (9th Cir. 1992) ("Redondo-Lemos I"). To establish a prima facie case of selective prosecution, the claimant must show that the prosecutorial policy (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose. <u>See Armstrong</u>, 517 U.S. at 465.

Petitioner has not made the required showing. First, this court has no authority to review questions of state prosecutorial discretion unless petitioner has made a prima facie case that the prosecutorial decision was constitutionally impermissible. According to the state appellate court, the prosecutor's decision rested on the legitimate, nondiscriminatory reason that it would be futile to charge Myles. Furthermore, questions about state evidentiary rules are questions of state, not federal, law. Whether the evidence against Myles was insufficient based on California's corpus delicti rule or whether a prosecutor's refusal to charge one co-conspirator prevents, as a matter of law, prosecution of another conspirator is beyond the reviewing power of this court.

Second, even if petitioner had presented a proper federal, perhaps due process, claim, petitioner's contention is not supported by the evidence – specifically, the evidence of petitioner's guilt is different from the evidence of Myles's guilt. The only evidence against Myles is Myles's own statements, whereas in petitioner's case the evidence consisted of Myles's testimony, corroborated by the presence of the two cans containing gasoline in petitioner's neighbor's barn, petitioner's recorded phone conversations, and his giving Myles $300 in cash and photographs of his wife to give to the (non-existent) hitman.

Third, insofar as this claim is based on the grounds that the evidence against petitioner was insufficient to support the verdict, it likewise fails.  The relevant inquiry on review of a constitutional challenge to the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  The reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  <u>Id.</u> at 326.

In California, murder is the unlawful, unjustified killing of another with malice aforethought. Cal. Pen. Code § 187.  "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts."  Cal. Pen. Code § 664.  California defines conspiracy, roughly speaking, as two or more persons conspiring to commit any crime.  Cal. Pen. Code § 182.

The record shows that evidence existed to support a reasonable trier of fact to find guilt of attempted murder and conspiracy to commit murder beyond a reasonable doubt.  Specifically, Myles's testimony about petitioner's plans to kill Leslie with Myles's help, and then with the (non-existent) hitman are indicative of petitioner having malice aforethought and of petitioner conspiring with another to commit a crime.  Other evidence of these elements are petitioner's own statements, and the presence of the gasoline cans in the barn.

Accordingly, the court concludes that the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented under  28 U.S.C. § 2254 (d)(1), (2).  Habeas relief on this claim is DENIED.

II.     <u>Ineffective Assistance of Trial Counsel</u>

Petitioner contends that trial counsel rendered ineffective assistance.  Specifically, he contends that:  (a) trial counsel failed to call crucial witnesses and present important evidence; (b) trial counsel failed to move to sever the charges of conspiring to murder and solicitation of

8

murder; (c) trial counsel failed to move to exclude evidence of all uncharged crimes; and (d) trial

counsel failed to object to instances of prosecutorial misconduct. Pet., P. & A. at 9, 19, 23, 24.

Claims of ineffective assistance of counsel are examined under <u>Strickland v. Washington</u>,

466 U.S. 668 (1984). In order to prevail on a claim of ineffectiveness of counsel, petitioner must

establish two things. First, he must establish that counsel's performance was deficient, i.e., that it

fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Id.</u> at

687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e.,

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is a probability

sufficient to undermine confidence in the outcome. <u>Id.</u> Where the defendant is challenging his

conviction, the appropriate question is "whether there is a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695. It is

unnecessary for a federal court considering a habeas ineffective assistance claim to address the

prejudice prong of the <u>Strickland</u> test if the petitioner cannot even establish incompetence under the

first prong. <u>See</u> <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).

a.      <u>Failure to Call Witnesses and Present Evidence</u>

Petitioner contends that trial counsel failed to present evidence and call witnesses that would

have impeached Myles's credibility. Pet., P. & A. at 9. Specifically, petitioner contends that trial

counsel should have: (i.) presented the recording of Myles's pre-polygraph interview and called the

polygraph examiner, Michael Floyd, to testify; (ii.) called Linda Pereira to testify as to the fact that

Myles falsified a police report and had a "pattern and propensity to falsely accuse petitioner";

(iii.) called Peggy McQuillan who could have testified that Myles forged checks in her name; and

(iv.) question Katherine Eanni about her knowledge regarding Myles having choreographed the

taped conversations he had with petitioner. <u>Id.</u> at 9-10, 11.

i.      <u>Pre-Polygraph Evidence</u>

Petitioner contends that trial counsel rendered ineffective assistance by not presenting  the

recording of Myles's pre-polygraph interview for purposes of impeaching Myles's testimony. These

recorded statements, petitioner contends, contradict Myles's testimony, including when he decided

1   not to murder Leslie, whether when he was "half-way to the place where he was to kill her" or when

2   he heard Leslie honked the car horn or when he saw Leslie in her car. Id. at 10, 14.

3          Petitioner's claim is without merit. As an initial matter, many of these contradictions were

4   brought up at trial. Petitioner lists many contradictions, the most significant being when Myles

5   abandoned his attempt to murder Leslie. Petitioner contends that this evidence would not only

6   impeach Myles's credibility, but if it could be shown that Myles abandoned his attempt, then

7   petitioner could not be charged with attempted murder or conspiracy to commit murder. Myles was

8   doggedly questioned on the differences between the statements he gave to the polygraph examiner,

9   and the statement he gave to police regarding when he decided that he would not murder Leslie. It

10  came out, then, that he had told different stories about whether he abandoned the attempt when he

11  was "halfway up the hill" or when he realized Leslie was honking the car horn – exactly the

12  information petitioner wanted presented. Ans., Ex.G5 at 585-88. Because these contradictions were

13  brought to light during cross-examination, petitioner cannot now claim that his trial counsel's

14  performance was deficient. Further, Myles's credibility was significantly undermined by Leslie's

15  testimony that Myles forged checks to her bank account, Myles's admission of having lied to the

16  police, and evidence that he had been dishonorably discharged from the Marines for forging postal

17  checks.

18         Because trial counsel adequately challenged Myles's credibility, trial counsel's performance

19  cannot be said to have been deficient. Accordingly, petitioner has not met the requirements of the

20  first prong of Strickland. Since petitioner has not shown a deficient performance, the court does not

21  reach the second prong of Strickland, that is, whether trial counsel's performance resulted in

22  prejudice to petitioner. Calderon, 133 F.3d at 737.

23         Because the court has found petitioner's contention about the admission of the pre-polygraph

24  evidence to be without merit, it is unnecessary to consider whether counsel's failure to call the

25  polygraph examiner, Michael Floyd, to the stand, constituted a deficient performance. Without

26  guidance from petitioner, the court presumes that Floyd would discuss the pre-polygraph

27  examination, evidence the court has already found was effectively presented.

28         The court, having conducted an independent review of the record, holds that the state

appellate court's decision was not an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d)(1). Habeas relief on this claim is DENIED.

## ii. Failure to Call Linda Pereira to Testify

Petitioner contends that trial counsel rendered ineffective assistance in failing to call Linda Pereira, who would have offered testimony to impeach Myles's credibility. Pet., P. & A. at 10, 11, 15. Pereira, the mother of Myles's girlfriend, rented a room to Myles after he was ordered to leave his father's house. Ans., P. & A. at 20. According to Pereira's statement to police, Myles failed to pay thousands of dollars of charges on a credit card Pereira and Myles held jointly. Pet., Ex. B at 1. Myles, according to this same statement, told Pereira that petitioner deliberately set fire to his residence and paid Myles to "keep his mouth shut." Id.

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. A difference of opinion as to trial tactics does not constitute denial of effective assistance, see United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), cert. denied, 454 U.S. 1127 (1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984), cert. denied, 469 U.S. 838 (1984). Whether counsel's actions were indeed tactical is a question of fact considered under 28 U.S.C. § 2254(d)(2); whether those actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1). Edwards v. LaMarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witness's testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).

Petitioner's contention is without merit. Under the standard articulated in Sanders, the court must defer to counsel's tactical decisions if they were reasonable under the circumstances. Trial counsel's decision not to call Pereira could have been based on the apparently reasonable

assumption that Pereira's testimony was unnecessary because other evidence had effectively

impeached Myles's credibility and that Pereira's testimony might have hurt petitioner. Leslie

testified that Myles forged checks to her bank account, Myles admitted having lied to the police, and

the jury was informed that he had been dishonorably discharged from the Marines for forging postal

checks. There is no evidence in the record that this decision suggests that counsel's decision was

other than a strategic one. In any event, petitioner was not prejudiced as the jury was well aware of

Myles's questionable honesty and integrity.

### iii.     Failure to Call Peggy McQuillan to Testify

Petitioner contends that trial counsel rendered ineffective assistance by failing to call Peggy

McQuillan who would have offered testimony to impeach Myles's credibility. Pet., P. & A. at 11.

According to petitioner, McQuillan could have testified that Myles had forged checks on her bank

account. Id. Myles contends that he found the checks and "simply forged them," another instance,

petitioner contends, of Myles stealing money and blaming another. Id.

As with the previous claim, petitioner's contention is without merit. Under the standard

articulated in Sanders, trial counsel's decision not to call McQuillan could have been based on the

reasonable assumption that McQuillan's testimony was unnecessary because Myles was otherwise

impeached with similar evidence. In any event, petitioner was not prejudiced. Leslie testified that

Myles forged checks to her bank account, Myles admitted having lied to the police, and the jury was

informed that he had been dishonorably discharged from the Marines for forging postal checks.

### iv.  Failure to Question Katherine Eanni About Taping Conversations

Petitioner contends that trial counsel rendered ineffective assistance by failing to question

Katherine Eanni, who did testify at trial, about statements she heard that would impeach Myles's

credibility. Pet., P. & A. at 11. According to petitioner, had trial counsel properly questioned her,

Eanni could have testified that while at her house in 1999, Myles told petitioner that "[petitioner and

Myles] had to makes tapes (consistent with petitioner's defense that the tapes were pre-planned, or

choreographed)." Id. In support of this assertion, petitioner provides a hard-copy of an e-mail

allegedly sent by Eanni to petitioner, stating, "Myles made the comment, 'oh yea dad that reminds

me I have to tape you when we get back, don't forget we have to do the tapes', [sic] something to

that affect [sic]."  Pet., Ex. E at 1.

The petitioner contended at trial that "Myles was afraid that [petitioner] would go to the police so he told [petitioner] to engage in these tape-recorded conversations.  [Petitioner] simply followed Myles's prearranged instructions and made incriminating statements about plotting to kill Leslie.  [Petitioner] stated that he intentionally made inconsistent statements so that it would be clear he had not intended to kill Leslie."  Loutzenhiser, 2002 WL 1308295 at *3.

The comment Myles allegedly made in front of Eanni lacks the specificity and detail necessary for it to have probative value.  Myles's alleged statement, given through Eanni's e-mail, does not indicate what conversations were to be taped or for what purpose.  Without more information, the court cannot conclude that counsel was ineffective for not examining Eanni about the statement.  The alleged statement without more lacks probative value.  Further, even if it is assumed that the statement pertained to making fake tapes pursuant to Myles's instruction, the testimony may have suggested that petitioner himself, at least in part, knowingly choreographed the conversations.

The court cannot find that counsel was ineffective for failing to examine Eanni on the statement or that petitioner was prejudiced by the failure to do so.  Therefore, petitioner has not met the requirements of Strickland.

b.  Failure to Move to Sever the Charges

Petitioner contends that trial counsel rendered ineffective assistance by failing to move to sever the charge of solicitation of murder from the charges of conspiracy to commit murder and attempted murder.  Pet., P. & A. at 19, 20, 21.  The charge of solicitation of murder arose from petitioner's acts in November and December 1999, while the other two charges at issue arose from petitioner's acts during December 1998.  Id. at 19, Ans., P. & A. at 23.  Petitioner contends that if such a motion had been made and granted, the "jury would not have had a seemingly stronger case to bolster a weak case, unrelated to the conspiracy/attempt, and there is a reasonable probability of a different and favorable outcome, i.e., acquittal."  Pet., P. & A. at 22.

Under the circumstances of the charged offenses, a motion for severance most likely would have been denied.  The three charged offenses all related to petitioner's desire to kill his wife,

13

Leslie.  Although the charged conduct spread over a period of time, most, if not all, the conduct charged in counts two and three would have been relevant to count one.  Counsel is not ineffective for failing to make a motion that lacks merit. "To show prejudice under <u>Strickland</u> from failure to file a motion, [petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him." <u>Wilson v. Henry</u>, 185 F.3d 986, 990 (9th Cir. 1999).  Petitioner's claim of ineffective assistance of counsel for failing to move for severance is without merit.

      c.     <u>Failure to Move to Exclude Evidence of Uncharged Crimes</u>

Petitioner contends that trial counsel rendered ineffective assistance by allowing "without objection" Myles's testimony, given in response to the prosecutor's questions, "that petitioner hired an ex-P.G.&E employee to kill Leslie, and that petitioner hired a prostitute to kill Lesley."  Pet., P. & A. at 23.  This issue was not raised on appeal.

The portion of Myles's testimony relevant to this inquiry is:

Q: Now, with regard to – you said that your father told you that he had another person
    to do it when you talked to him [].  Had you previously discussed with your father
    whether somebody else was involved in this?

A: Yes.  Often he had told me about other people that he tried getting involved in it,
    but they had gone back on their word or taken his money and left.

Q: How many other people did he identify to you?

A: Approximately maybe two, three, or four people.  I know it was more than – at
    least more than two.

Q: Did he identify these people by name?

A: No.

Q: Did he identify the people by – in any way that you can described?

A: There's only one person he said he used to work with at PG&E that he discussed
    while we were in Disney World, but there's never any names discussed nor where they
    lived.

1      Q: So he discussed using a PG&E coworker?

2      A: Yes, a coworker that no longer worked there.

3      Q: Did he tell you who that person was?

4      A: No, he did not.

5      Q: Did he tell you what that person was going to do?

6      A: He said that that person was going to murder Leslie.

7      Q: Did he tell you – I'm sorry.  Are you through?

8      A: He never told me how.  It was – he referenced some of the tactics that he wanted to

9      use, but he never said exactly how it was going to be done, just that he was going to

10     hire him to murder Leslie.

11     Q: And when did that happen?

12     A: That particular person from PG&E?

13     Q: Yes.

14     A: It was before I came out – got out of the Marine Corps, before November of '98

15     Q: Did he describe to you anybody else that he was involved with?

16     A: Yes.  He told me – he had told me he'd gotten a hooker and to that hooker, there

17     was another relative or person that hooker knew and that that person was basically

18     ruthless and was tight for money and would do something like this for him.  And he

19     had given them a couple thousand dollars, and they had split on him.

20     Q: Did he tell you when that happened in the context of your involvement in this?

21     A: Uh – I can't remember the exact date, but I think it was in the summer of '99.

22     Q: Did he identify any of the people, the hooker or the ruthless person, to you by

23     name.

24     A: No.

25 Ans., Ex. G4 at 494-495.

26     Preliminarily, the court notes that the admission of evidence is not subject to federal habeas

27 review unless a specific constitutional guarantee is violated or the error is of such magnitude that the

28 result is a denial of the fundamentally fair trial guaranteed by due process.  See <u>Henry v. Kernan,</u>

197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986), cert. denied, 479 U.S. 839 (1986). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. See Henry, 197 F.3d at 1031; Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

Petitioner's claim is not that his due process rights were violated by the admission of the evidence. Rather, he faults his counsel for failing to move to exclude it. Petitioner has not shown that the admission – or counsel's failure to object – was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. As an initial matter, the evidence to support the convictions on the charged offenses was quite strong, so much so that the testimony to which petitioner objects could not have resulted in prejudice: Myles's testimony as to the acts giving rise to the charged offenses, petitioner's own statements, the presence of the gasoline containers in his neighbor's barn, the cash and photographs he handed to Myles for him to give to the (non-existent) hitman. Furthermore, per Jammal, the jury could draw the permissible inference that Myles's testimony gave evidence of petitioner's state of mind and intent, and that his decision to have Leslie murdered was the result of deliberation, extensive planning, and forethought.

As stated above, to show ineffective assistance of counsel for failing to make a motion, petitioner must show that had his counsel filed the motion, it would likely been granted it as meritorious. Here, because a permissible inference the jury could have drawn from the objected-to evidence was that petitioner engaged in deliberation and planning, the trial court would undoubtedly have denied any motion to exclude. Thus, trial counsel's failure to object did not constitute a deficient performance.

d.    Failure to Object to Instances of Prosecutorial Misconduct

Petitioner contends that trial counsel rendered ineffective assistance by not objecting to instances of prosecutorial misconduct. According to petitioner, trial counsel should have objected to the fact that the prosecutor "presented testimony she knew to be perjured; she argued facts she knew to be false; she asked the jury to speculate on crimes not put into evidence; she bolstered and begged the jury to give Myles more credibility with misstatements of the evidence, specifically to bolster his credibility; she, on at least two occasions, told the jury that petitioner had the burden [sic] proof."

Pet., P. & A. at 24.  More specifically, according to petitioner, the prosecutor committed misconduct by failing to properly question Myles on matters he allegedly lied about during his polygraph examination, argued that Myles "received nothing for going to the police, yet we know that he essentially received immunity he was promised by the polygraph examiners" and focused the jury's attention away from whether Myles would be prosecuted, said that Myles was motivated out of love for his father rather than by the bribe he received from his father, called petitioner a liar, and other statements at variance with what petitioner takes to be the facts of the case.  Id. at 24-26.  This claim was apparently not raised on appeal.

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  See id.; Smith v. Phillips, 455 U.S. 209, 219 (1982).  A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted), cert. denied, 516 U.S. 1017 (1995).

Factors which a court may take into account in determining whether prosecutorial misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare United States v. Young, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with United States v. Schuler, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because government's case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, see Darden, 477 U.S. at 182.

Petitioner's claim is without merit.  Considering the factors a court uses to determine

whether there has been a due process violation, the court finds that petitioner has not shown that any of these statements rendered his trial fundamentally unfair or resulted in prejudice. First, the weight of the evidence against petitioner was overwhelming: the presence of the cans containing gasoline, Myles's testimony, and taped conversations of petitioner discussing the murder of Leslie. Petitioner has not supported an argument that the alleged acts of misconduct were part of a pattern of ongoing misconduct. Rather, the prosecutor's argument appears to have been based on the People's view of what the evidence showed.

As for the question "what would happen to Myles," the state appellate court discussed in detail that the state prosecutor not only did not grant Myles immunity, but that filing charges against Myles would be futile because the corpus delicti rule would compel the court to dismiss them. As to petitioner's assertions that the prosecutor led the jury away from questioning Myles's credibility, the court finds no misconduct. A prosecutor has obligation to argue her witness's credibility and, in any event, Myles's credibility was called into question.

Because the court has found that the record shows no instances of prosecutorial misconduct, the court cannot say that trial counsel's failure to object constituted a deficient performance. Therefore, petitioner has not met the requirements of the first prong of <u>Strickland</u>. Because there is no evidence that trial counsel's performance was deficient, the court need not consider whether the second prong of <u>Strickland</u> was met, that is, whether trial counsel's performance resulted in prejudice to petitioner. <u>Calderon</u>, 133 F.3d at 737.

III.    <u>Ineffective Assistance of Appellate Counsel</u>

Petitioner contends that his appellate counsel rendered ineffective assistance of counsel by failing "to raise several issues on direct appeal which were both meritorious <u>and</u> had a likelihood of success." Pet., P. & A. at 30. According to petitioner, appellate counsel failed to introduce evidence that would undermine the prosecution's case and impeach the prosecution's key witness, object to prosecutorial misconduct, object to other crimes evidence, raise the issue that the evidence for solicitation for murder was insufficient, and he failed to appeal the trial court's <u>Miranda</u> ruling. <u>Id.</u>

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. <u>See</u> <u>Evitts v. Lucey</u>, 469 U.S. 387,

391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  See Jones v. Barnes, 463 U.S. 745, 751-754 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller, 882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice for the same reason – because he declined to raise a weak issue.  Id.

With the exception of the trial court's Miranda ruling, all the issues petitioner raises have been thoroughly addressed above:  failing to introduce evidence that would undermine the prosecution's case and impeach the prosecution's key witness, failing to object to prosecutorial misconduct, failing to object to other crimes evidence, and failing to raise the issue that the evidence for solicitation for murder was insufficient.  Therefore, the court will not repeat its analysis.

In his Miranda claim, petitioner contends that the evidence shows that it was "not entirely clear that petitioner understood each of these [Miranda] rights, or merely heard them."  Pet., P. & A. at 36.  In sum, petitioner contends that there is no evidence to show that petitioner's waiver was knowing and voluntary.  Id. at 35, 36.  His responses – "okay" and "uh-huh" – to the Miranda recitation were, at best, ambiguous, he contends.  This issue was apparently not raised on appeal.

The trial court held a hearing on the admissibility of petitioner's custodial statements.  It reviewed the audio tape and transcript of the investigating officer, Detective Badger, reading petitioner his Miranda rights.  The transcript of the audio taped conversation reflects the following custodial interchange:

Q:  You know you have the right to remain silent?

A: Uh-huh.

Q: Okay.  And anything you can say – anything you say can and will be used against

you in Court.

A: Uh-huh.

Q: Do you know you have the right to have an attorney present when we are talking or

19

1    before talking, questioning, if you'd like?

2    A: Yeah.

3    Q: Do you understand that?

4    A: Okay, yeah.

5    Q: Okay. If you can't afford to hire an attorney, one will be appointed to represent

6    you. That means that they pay for one for you.

7    A: Okay.

8    Q: Okay. Do you understand what I just explained to you pretty much?

9    A: Yes, sir.

10    Q: Do you have any questions about that at all?

11    A. No, I don't think I do.

12 Ans., Ex. F at 18-19.

13    Claims of the admissibility of custodial statements are analyzed under <u>Miranda v. Arizona</u>,

14 384 U.S. 436 (1966), and its progeny. Habeas relief should be granted if the admission of statements

15 in violation of <u>Miranda</u> "had a substantial and injurious effect or influence in determining the jury's

16 verdict." <u>Calderon v. Coleman</u>, 525 U.S. 141, 147 (1998). <u>Miranda</u> requires that a person subjected

17 to custodial interrogation be advised prior to questioning that he has the right to remain silent, that

18 statements made can be used against him, that he has the right to counsel, and that he has the right to

19 have counsel appointed. <u>Id.</u> at 444. Once properly advised of his rights, an accused may waive

20 them voluntarily, knowingly and intelligently. <u>Id.</u> at 475. Whether there has been a valid waiver of

21 <u>Miranda</u> rights depends upon the totality of the circumstances, including the background, experience

22 and conduct of the defendant. <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).

23    The government must prove, by a preponderance of the evidence, that the defendant was

24 aware of "the nature of the right being abandoned and the consequences of the decision to abandon

25 it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). A showing that there was a proper recitation of

26 <u>Miranda</u> rights and that the defendant knew his rights generally is sufficient to establish that he

27 knowingly and intelligently waived them. <u>Paulino v. Castro</u>, 371 F.3d 1083, 1086-87 (9th Cir.

28 2004).

Petitioner's claim is without merit. Petitioner has not shown that his <u>Miranda</u> rights were violated. Rather, the evidence indicates that there was a proper recitation of the <u>Miranda</u> warnings – including the right to remain silent and to have an attorney present. The court finds that petitioner's responses to recitation of these rights indicate that he knew and understood his rights. In fact, there is no evidence at all to the contrary. Because the court finds no evidence to indicate that the custodial statements were admitted in violation of petitioner's rights, petitioner's claim that his appellate counsel's failure to appeal the trial court's ruling constituted a deficient performance under <u>Strickland</u>. Because petitioner has not met the requirements of the first prong of <u>Strickland</u>, the court need not answer the question whether the counsel's performance resulted in prejudice.

## CONCLUSION

The court, having conducted an independent review of the record, concludes that the state court's adjudications did not result in any decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. The court also concludes that the state court's adjudications did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

The clerk shall close the file.

**IT IS SO ORDERED.**

DATED: 12/27/2007

_Ronald M. Whyte_
RONALD M. WHYTE
United States District Judge

1  This is to certify that on ___12/27/2007_____, a copy of this ruling was mailed to

2  the following:

3  **Paul Douglas Loutzenhiser**

4  P-97763
   CSP-Solano

5  CSP - Sol. III 2-103U
   P.O. Box 4000

6  Vacaville, CA  95696-4000

7  **Violet May Lee**

8  Deputy Attorney General
   California Attorney General's Office

9  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28